# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| | : | |
| v. | : | No. 3:11cr12 (MRK) |
| | : | |
| | : | |
| RAFAEL RODRIGUEZ; JOCELYN | : | |
| PEREZ | : | |

## MEMORANDUM OF DECISION

Rafael Rodriguez, one of the two Defendants in this case, was indicted for conspiracy to distribute and to possess with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(B)(i), and 846; possession with intent to distribute heroin, in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(B)(i); and conspiracy to maintain a drug-involved premise, in violation of 21 U.S.C. §§ 856(a)(1), 856(b), and 846. Mr. Rodriguez has moved to suppress all evidence seized from him and from the premises known as 146 Mark Twain Drive in Hartford, Connecticut ("the House"). *See* Mot. to Suppress [doc. # 27]. The Court received briefs from the parties and held an evidentiary hearing on the Motion to Suppress on May 19, 2011.

The issues raised in the Motion to Suppress are as follows: (1) whether the Government violated Rule 41 of the *Federal Rules of Criminal Procedure*; (2) whether errors in the affidavits supporting the application for a warrant to search the House and Mr. Rodriguez's car created a *Franks v. Delaware*, 438 U.S. 154 (1985), issue in this case; (3) whether there was probable cause to seek a search warrant for the House and Mr. Rodriguez's car; and (4) whether the items found on Mr. Rodriguez's person – cash, two cell phones and (possibly) a key to the House – were

unlawfully seized.[1] Having considered the arguments of the parties and the evidentiary hearing record, the Court GRANTS IN PART and DENIES IN PART the Motion to Suppress.

## I.

The Court will briefly set forth the facts. More information about the searches and seizures in question may be found in the affidavits submitted in support of the search warrants and criminal complaint. *See* Aff. of Abhilash Pillai in Supp. of Warrant Application, Jan. 6, 2011 ("Pillai Aff. I"), Ex. A to Mem. in Opp'n [doc. # 33-1] at 4-18; Aff. of Abhilash Pillai in Supp. of Criminal Compl., Jan. 7, 2011 ("Pillai Aff. II"), Ex. H to Mem. in Opp'n [doc. # 33-8] at 3-8. In December 2010, after receiving information from a confidential informant ("CHS-1"), Hartford police detectives conducted surveillance at the House. CHS-1, who was registered with both the Hartford Police Department and the Federal Bureau of Investigation ("FBI"), had previously supplied reliable information about drug trafficking. CHS-1 told police that Mr. Rodriguez was engaged in drug dealing with the help of his companion, Jocelyn Perez.

At various times on or between December 21, 2010 and January 3, 2011, law enforcement agents conducted surveillance of the House. On several occasions, investigators observed Mr. Rodriguez exit the rear door of the House and then enter and drive a Honda Accord with tinted windows bearing Connecticut marker plate 253-XWA ("the Honda").

Under the observation of investigators, CHS-1 engaged in two controlled narcotics transactions with the Defendants – one with Ms. Perez, and one with Mr. Rodriguez – in late December 2010 and early January 2011. During the week ending December 31, 2010,

---

[1] Mr. Rodriguez also seeks to suppress certain statements he made at the House, but the Government does not intend to introduce those statements in its case in chief. *See* Mem. in Opp'n [doc. # 33] at 17. If Mr. Rodriguez testifies at trial, and the Government wishes to use his statements, the Court will address that subject at trial.

investigators met with CHS-1 for the purpose or arranging a controlled drug purchase from Mr. Rodriguez. Under the supervision and at the direction of investigators, CHS-1 placed a telephone call to Mr. Rodriguez's cell phone and told Mr. Rodriguez that he wanted to meet. *See* Pillai Aff. I, Ex. A to Mem. in Opp'n [doc. # 33-1] ¶ 11. Mr. Rodriguez told CHS-1 to go to the parking lot at 85 Dillon Road in Hartford, where CHS-1 would meet Ms. Perez. In this and other telephone conversations, Mr. Rodriguez did not discuss specific quantities or prices with CHS-1.

During the week beginning January 3, 2011, while investigators were conducting surveillance of the House, Mr. Rodriguez arrived there in the Honda with an unknown male as the front seat passenger. Both men exited the Honda and entered the rear door of the House. The unknown male was carrying a plastic bag. Shortly after observing Mr. Rodriguez arrive at the House, investigators again met with CHS-1 for the purpose of arranging a controlled purchase from Mr. Rodriguez. Under the supervision and at the direction of investigators, CHS-1 placed a telephone call to Mr. Rodriguez's cell phone. During the phone conversation, Mr. Rodriguez told CHS-1 to meet him in the parking lot of 85 Dillon Road. Mr. Rodriguez was observed departing the House through the rear door, driving the Honda to 85 Dillon Road, and meeting with CHS-1 in the Honda. Following the meeting, investigators met with CHS-1 at a pre-arranged meeting location. The CHS-1 reported that Mr. Rodriguez had said he had just acquired heroin and needed time to package it. The next day, CHS-1 again met Mr. Rodriguez in the parking lot at 85 Dillon Road, and using funds provided by investigators, he purchased heroin from Mr. Rodriguez, specifically, 100 sealed plastic sleeves labeled "Blu Dragon."

On January 5, 2011, Hartford Police Detectives Abhilash Pillai and Mark Rinaldi applied for a search and seizure warrant for the House in the Connecticut Superior Court. The Superior

Court judge expressed concern about whether there was probable cause to search the House, but agreed to sign the warrant. However, Detective Pillai instead decided to seek a second legal opinion and sought review by the United States Attorney's Office. After adding another paragraph (paragraph 15) to the affidavit in support of the warrant application, the affidavit was submitted to United States Magistrate Judge Donna Martinez. Paragraph 15 stated as follows:

> During the week of January 3, 2011, members of the surveillance team were conducting surveillance of the Premises [at 146 Mark Twain Drive]. RODRIGUEZ arrived in the Honda, with an unknown male as the front seat passenger. Both men exited the Honda, and entered the rear door of the Premises. The unknown male was carrying a plastic bag. Shortly after observing RODRIGUEZ arrive at the PREMISES, I, along with other investigators, met with CHS-1 for the purpose of arranging a controlled purchase from RODRIGUEZ. CHS-1 and his/her vehicle was searched to confirm s/he was not in possession of any controlled substance, money or contraband. I then provided CHS-1 a sum of United States currency form the Hartford Police Narcotics Drug Fund for the purpose of purchasing narcotics from RODRIGUEZ. Under the supervision and at the direction of the investigators, CHS-1 placed a telephone call to RODRIGUEZ's cell phone [the number is stated]. During the phone conversation, RODRIGUEZ told CHS-1 to meet in the parking lot of 85 Dillon Road. RODRIGUEZ was observed departing the PREMISES through a rear door, driving the Honda to 85 Dillon Road, and meeting with CHS-1 in the Honda. CHS-1 reported that the transaction did not occur because RODRIGUEZ reported that he just acquired 100 grams of heroin and was in the process of packaging the heroin and needed several hours before the heroin would be ready for delivery.

Pillai Aff. I, Ex. A to Mem. in Opp'n [doc. # 33-1] ¶ 15.

Assistant United States Attorney ("AUSA") Brian Leaming arranged to meet with Magistrate Judge Martinez to present the affidavit and seek a search warrant. Detective Pillai accompanied AUSA Leaming to Magistrate Judge Martinez's chambers. On January 6, 2011, Magistrate Judge Martinez authorized search and seizure warrants for the House and the Honda.

On January 7, 2011, the officers executed the warrants. At approximately 3:35 p.m., investigators – including at least one FBI Special Agent – entered the House, where Ms. Perez was present with an adult male and her four minor children. Ms. Perez confirmed that she had

resided there for approximately three months. A search of the House began immediately, and before 3:50 p.m., substantial quantities of heroin – 3482 bags of heroin, with 1300 of those marked "Blu Dragon" – were seized from a hallway closet on the second floor.

Meanwhile, at approximately 3:40 p.m., Hartford police officers, including Detective Rinaldi and Detective Alexander Estrella, detained Mr. Rodriguez shortly after he entered the Honda in the parking lot of 72 Albany Avenue. Police approached the car with their handguns or tasers drawn. Mr. Rodriguez was handcuffed, subjected to a pat down for weapons, and placed in a marked police cruiser while an initial search of the Honda's interior began. According to Detective Rinaldi's testimony, when Mr. Rodriguez was handed over to Detective Rinaldi at 72 Albany Avenue for a pat down search, Detective Rinaldi asked whether Mr. Rodriguez had anything on him that could harm the detective, and Mr. Rodriguez said he had cash and cell phones in his front pocket. Detective Estrella testified that he, too, asked Mr. Rodriguez whether he had anything on him prior to conducting a pat down search, and Mr. Rodriguez replied that he had some cash. Detective Rinaldi and Detective Estrella both testified that they did not seize the cell phones or cash from Mr. Rodriguez at that time.

While they were conducting the vehicle search at Albany Avenue, Detective Rinaldi received a call on his radio from Detective Pillai, who was one of the investigators at the House. Detective Pillai informed Detective Rinaldi that a large quantity of drugs had been found and told him to bring Mr. Rodriguez to the House. The investigators transported Mr. Rodriguez and the Honda to the House, where a narcotics dog was present. By approximately 3:50 p.m., Mr. Rodriguez had arrived at the House in the marked police cruiser.

At the House, investigators conducted a more thorough search of the Honda using the narcotics dog. No narcotics or other contraband was found in the Honda. According to Detective

Estrella's testimony, Detective Estrella asked investigators at the House what was to be done with Mr. Rodriguez. Someone – Detective Estrella did not recall who – said that Mr. Rodriguez was under arrest. Detective Estrella told the other investigators that Mr. Rodriguez had previously indicated that he had cell phones and cash on his person, and asked whether he should seize those items. One of the officers – again, Detective Estrella did not recall who – said yes. Detective Estrella then seized two cell phones and $1,201 of cash from Mr. Rodriguez's front pockets. Although on an inventory the cell phones and the cash are listed as having been located at 72 Albany Avenue, *see* Evidence Inventory Form, Jan. 7, 2011, Ex. D to Mem. in Opp'n [doc. # 33-4], Detective Estrella had no doubt whatsoever that he seized those items from Mr. Rodriguez at the House, and the Court credits his testimony. The search of the House continued, and investigators recovered heroin packaging and processing paraphernalia, as well as a bag later confirmed to contain 77 grams of heroin.

Ms. Perez was advised of her *Miranda* rights, which she waived. She admitted that the substance recovered from the House was heroin and that she knowingly permitted the heroin to be stored in her residence. She told investigators that the heroin belonged to Mr. Rodriguez, whom she identified as her cousin. She also said that Mr. Rodriguez did not live at the House but used it to process, package, and store heroin. In the dining area of the House, investigators observed and seized two prescription containers, one with Ms. Perez's name and one with Mr. Rodriguez's name, both with the address "146 Mark Twain Drive." Police also found a pair of pants, which Ms. Perez said belonged to Mr. Rodriguez.

On the basis of these facts, Mr. Rodriguez raises several arguments which the Court will address in turn.

## II.

Mr. Rodriguez's first argument is that the search warrants for the House and Honda were invalid under Rule 41 of the *Federal Rules of Criminal Procedure* because the application was made by a Hartford police officer.[2]  Specifically, Mr. Rodriguez argues that Detective Pillai was not acting as a federal officer or assigned to a federal task force when he applied for the federal search warrants on January 6, 2011, and thus the warrants were not issued "[a]t the request of a federal law enforcement officer or attorney for the government" as required by Rule 41(b).

Detective Pillai submitted the application for warrants to search the House and Honda in his capacity as "Special Deputy United States Marshal." *See* Application for a Search Warrant in the Matter of the Search of 146 Mark Twain Drive, Hartford, Connecticut ("Federal Search Warrant Application"), Ex. A to Mem. in Opp'n [doc. # 33-1] at 3. The Ninth Circuit – which is the only circuit that has considered this issue – has held that "deputation as a Special Deputy U[nited] S[tates] Marshal confers 'federal law enforcement officer' status on a state law enforcement official" for Rule 41 purposes. *United States v. Weiland*, 420 F.3d 1062, 1070 (9th Cir. 2005) (finding that because a detective "authored the warrant affidavit in his capacity as a Special Deputy U.S. Marshal, not in his capacity as a local law enforcement official . . . . [he] was a 'government agent . . . engaged in enforcing the criminal laws' as authorized by the Attorney General, and his request for a warrant did not violate Rule 41" (quoting Fed. R. Crim. P. 41(a)(2)(C)).

---

[2] Mr. Rodriguez must have standing to challenge the search of the House. Given that he had a key to the House and that inside the House the police found Mr. Rodriguez's pants and a prescription bottle with his name and the House's address, the Court is willing to assume, without deciding, that Mr. Rodriguez has standing to challenge the validity of the search of the House.

Initially, the Government maintained that Detective Pillai qualified as a "federal law enforcement officer" because he applied for the warrants in his capacity as a Special Deputy United States Marshal, and he was authorized to do so by the FBI. However, the Government later modified its position, and acknowledged that Detective Pillai may not have been authorized by the FBI to apply for the warrants. At the evidentiary hearing, FBI Special Agent ("SA") William B. Aldenburg testified that Detective Pillai indeed had been deputized as a Special Deputy United States Marshal and had worked with the FBI Organized Crime Drug Enforcement Task Force ("OCDETF"). But SA Aldenberg explained that there are two ways in which a local police officer can be deputized by the FBI – a general Title 21 authorization, and an authorization that is limited to a specific case. The Government concedes that there is no paperwork showing that Detective Pillai had received the general Title 21 authorization. Rather, Detective Pillai's deputation by the United States Marshals Service and FBI authorized him to participate in a large investigation that is unrelated to Mr. Rodriguez's case. *See* United States Marshals Service Special Deputation Appointment, Ex. J to Mem. in Opp'n [doc. # 33-10] at 2 (limiting Detective Pillai's special deputation authority to seeking and executing arrest and search warrants supporting a federal task force and to monitoring Title III intercepts, and stating that the deputation did not include authorization to participate in Federal drug investigations unless also deputized by DEA or FBI); FBI Oath of Office and Credential - Special Deputation, Ex. K to Mem. in Opp'n [doc. # 33-11] at 2 (deputizing Detective Pillai "For Investigation 281D-NH-46153").

Mr. Rodriguez maintains that Detective Pillai's lack of authorization to serve a Special Deputy United States Marshal for this particular case precluded him from qualifying as a "federal law enforcement officer" under Rule 41(b). The Court has not located any case that takes up that precise issue, and the Court is not sure whether the fact that Detective Pillai was deputized for a

particular case other than that of Mr. Rodriguez is meaningful in the context of Rule 41's requirement that a request for a federal search warrant be made by "a federal law enforcement officer or an attorney for the government." Fed. R. Crim. P. 41(b). However, even if Detective Pillai did not qualify as a "federal law enforcement officer" when he submitted his affidavit and federal search warrant application, Rule 41 does not require the Court to suppress the evidence recovered pursuant to the warrants signed by Magistrate Judge Martinez.

The Court rejects Mr. Rodriguez's Rule 41 challenge to the search warrants for at least two reasons.

First, the application was presented to Magistrate Judge Martinez by an AUSA. Rule 41(b) provides that a magistrate may issue a warrant "[a]t the request of a federal law enforcement officer *or an attorney for the Government*." Fed. R. Civ. P. 41(b) (emphasis added). It is undisputed that Detective Pillai prepared the warrant application under the supervision of the United States Attorney's Office, and that AUSA Leaming accompanied Detective Pillai when he submitted the warrant application and affidavit to Magistrate Judge Martinez. As Mr. Rodriguez points out, the warrant application did not identify AUSA Leaming as the applicant, and the warrant was not issued in AUSA Leaming's name. Nonetheless, AUSA Leaming's involvement satisfies the requirement that a warrant be issued at the request of a federal law enforcement officer or an attorney for the Government.

Although the Second Circuit has not yet spoken on this issue, numerous "courts have held that even minimal involvement by an AUSA is sufficient to prevent a finding of a violation of Rule [41(b)]." *United States v. Burka*, 700 F. Supp. 825, 831 (E.D. Pa. 1988) (citing cases from the Fifth, Sixth, and Tenth Circuits). In *United States v. Johnson*, 641 F.2d 652 (9th Cir. 1980), for example, the Ninth Circuit held that an AUSA who made the initial telephone call to the magistrate

judge to request a warrant was the "requestor" as a matter of law under Rule 41, even though it was a state officer who applied for the warrant and provided the supporting affidavit. *Id.* at 656; *see also United States v. Contreras*, No. CR 90-207-FR, 1991 U.S. Dist. LEXIS 2126, at *4 (D. Ore. Feb. 11, 1991) (finding no violation of Rule 41 where an AUSA personally arranged for judicial review of the affidavit supplied by a local police officer, and the AUSA was present when the affidavit was reviewed and the order for the warrant was signed). In *United States v. Massey*, 687 F.2d 1348 (10th Cir. 1982), the Tenth Circuit held that a warrant was issued "upon request of . . . an attorney for the government," despite the fact that it was issued upon the affidavit of an agent of the Oklahoma Narcotics Bureau, where the United States Attorney telephoned the judge in advance and accompanied the state agent to present the affidavit to the judge. *Id.* at 1356 (alteration in original; quotation marks omitted); *see also United States v. Beaumont*, 972 F.2d 553, 559 (5th Cir. 1992) (holding that Rule 41 was satisfied where an AUSA made the initial telephone call to the state judge who issued the warrant, and the AUSA accompanied the state agent to apply for the warrant); *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1514 (6th Cir. 1988) (finding that the requirements of Rule 41 were satisfied where an AUSA accompanied the state officer to the magistrate to obtain the warrant, and the warrant was issued to a federal law enforcement officer); *United States v. Parker*, 836 F.2d 1080, 1083 (8th Cir. 1987) ("Because the search warrant was issued at the request of *both* Detective Thomure and U.S. Attorney Fagan based upon the affidavit of Detective Thomure, we do not agree that the warrant was issued in violation of [R]ule 41." (emphasis in original)).

District courts within the Second Circuit have reached similar conclusions. In *United States v. Jennings*, No. 3:09-CR-447, 2009 U.S. Dist. LEXIS 109025, at *11 (N.D.N.Y. Nov. 23, 2009), the court concluded that Rule 41(b) was satisfied because the United States Attorney's Office

supervised the preparation of the supporting affidavit, prepared the warrant and sealing order, and accompanied the affiant to obtain the warrant. *Id.*; *see also United States v. Gehl*, No. 93-CR-300, 1994 U.S. Dist. LEXIS 9724, at *23 (N.D.N.Y July 15, 1994) (finding no violation of Rule 41 where the AUSA prepared the warrant application and affidavit signed by the investigator, accompanied the investigator, and presented the warrant application to the federal magistrate). In *United States v. McDaniel*, No. 03cr550 (LTS), 2003 U.S. Dist. LEXIS 14865, at *13-*14 (S.D.N.Y. Aug. 29, 2003), the court found that Rule 41(b) was satisfied, despite the fact that the search warrant had been obtained by a local law enforcement officer, because an AUSA had appeared before the magistrate with the local officer to apply for the warrant.

Mr. Rodriguez disputes the possibility that the "mere presence" of the AUSA "with Pillai when the affidavits and applications were submitted to Magistrate Martinez meets the requirements of Rule 41." Def.'s Post-Hr'g Mem. [doc. # 42] at 6. He attempts to distinguish this case from *McDaniel* on the basis that "there was no claim in *McDaniel* that the local officer's role was falsely represented, that he misrepresented his authority pursuant to a claim of right under either a federal marshal deputation . . . , that he was essentially acting in a rogue capacity, or that a state judge refused to sign a nearly identical application . . . ." *Id.* That argument, however, conflates two separate issues. Mr. Rodriguez's suggestion that Detective Pillai misrepresented his authority is relevant only if the Court finds a violation of Rule 41 and thus must determine whether the violation was the result of "intentional and deliberate disregard of a provision in [Rule 41]." *United States v. Burke*, 517 F.2d 377, 387 (2d Cir. 1975). If the involvement of AUSA Leaming satisfies the requirement that the warrant be requested by "a federal law enforcement officer or an

attorney for the Government," there is no violation of Rule 41(b), and the manner in which Detective Pillai represented himself is moot.[3]

Second, even if the Court assumes for the sake of argument that AUSA Leaming's involvment did not suffice to satisfy Rule 41(b), and that the application for the warrant technically violated Rule 41 because Detective Pillai was not deputized as a Special Deputy United States Marshal for this particular case, that violation would not merit suppression as a remedy. The Second Circuit has stated:

> Violations of Rule 41 alone should not lead to exclusion unless (1) there was "prejudice" in the sense that the search might not have occurred or would not have been so abrasive if the Rule had been followed, or (2) there is evidence of intentional and deliberate disregard of a provision in the Rule.

*United States v. Pangburn*, 983 F.2d 449, 455 (2d Cir. 1993) (quoting *Burke*, 517 F.2d at 386-87) (quotation marks omitted).

Mr. Rodriguez does not indicate any basis for the Court to conclude that he was prejudiced by Detective Pillai's status as a Hartford Police Detective. For example, Mr. Rodriguez concedes that Rule 41 would have permitted AUSA Leaming to sign the warrant application as "an attorney for the Government," and there is no basis to conclude that Magistrate Judge Martinez would have refused to sign the warrant, or that the resulting search would have been any less abrasive, if the application had been in the name of the AUSA himself. Officer Pillai's identification of himself as

---

[3] In his attempt to conflate the two steps of the Rule 41(b) inquiry, Mr. Rodriguez also misrepresents the Eighth Circuit's analysis in *Parker*, 836 F.2d 1080 (mistakenly referred to as "*United States v. Paulen*"). *See* Def.'s Post-Hr'g Mem. [doc. # 42] at 5. The *Parker* court found that "[b]ecause the search warrant was issued at the request of both [the St. Louis detective] and [the U.S. Attorney] based on [the detective's] affidavit," there was no violation of Rule 41. *Parker*, 836 F.2d at 1083. *After* rejecting Mr. Parker's contention that the warrant was issued in violation of Rule 41, the court added: "Moreover, there is no evidence presented to this court to suggest either an intentional disregard of Rule 41, or that Parker was prejudiced in any way." *Id.*

a Special Deputy United States Marshal was irrelevant to the existence or absence of probable cause.

Nor is there any evidence that Detective Pillai applied for the warrant with intentional and deliberate disregard of a provision of Rule 41. "Deliberate and intentional disregard" for Rule 41 generally entails "bad faith" or "an intent to flout the Rule." *United States v. Williamson*, 439 F.3d 1135, 1134 (9th Cir. 2006) (citations and quotation marks omitted); *see, e.g.*, *United States v. Luk*, 859 F.2d 667, 673 (9th Cir. 1988) (refusing to exclude evidence on the basis of a Rule 41 violation without evidence of "bad faith"). Mr. Rodriguez insists that the Court should infer bad faith on the part of Detective Pillai on several grounds. In particular, Mr. Rodriguez argues that Detective Pillai's submission of the warrant affidavit to Magistrate Judge Martinez represented "forum shopping," and that the Court should infer that Detective Pillai must have been acting in bad faith because the Government did not call Detective Pillai to testify at the evidentiary hearing. The Court finds those arguments unconvincing.

First, Mr. Rodriguez's "forum shopping" claim is based on the false premise that Detective Pillai "shopped" his warrant application to the federal magistrate after the application was rejected by a state court judge. In fact, Detective Pillai affirmed that state court judge was willing to sign the warrant, but expressed concerns about probable cause. Moreover, after the state court judge expressed concerns, Detective Pillai did not simply run to the federal magistrate. Rather, he sought review by the United States Attorney's Office. Indeed, AUSA Leaming has confirmed that Detective Pillai could not have submitted his application to Magistrate Judge Martinez without first receiving the approval of the United States Attorney's Office. *See* Mem. in Opp'n [doc. # 33] at 20 (explaining that an "affiant cannot 'shop' a search warrant application to a federal magistrate without first receiving approval from the United States Attorney's Office").

Second, no part of the record supports an inference that Detective Pillai acted in bad faith. In his Post-Hearing Brief [doc. # 42], Mr. Rodriguez argues for the first time that the Court should infer that Detective Pillai acted in bad faith because Detective Pillai did not testify at the evidentiary hearing. Mr. Rodriguez notes that the Court ordered the Govenrment to make Detective Pillai available to testify at the hearing, and suggests "the failure of the government to call Detective Pillai provides sufficient grounds for an adverse inference against any representations that [Detective] Pillai acted in good faith." Def.'s Post-Hr'g Mem. [doc. # 42] at 1. In fact, Detective Pillai was present for the evidentiary hearing and available to be called as a witness by either party. It is true that the Government did not call Detective Pillai, but Mr. Rodriguez at that point had not argued that Detective Pillai's alleged violation of Rule 41 was "intentional and deliberate," let alone that a failure by the Government to call Detective Pillai as a witness would support an inference of bad faith. Nor did Mr. Rodriguez's counsel make that argument at the evidentiary hearing, or, for that matter, call Detective Pillai to the witness stand himself. In those circumstances, the Government's failure to have Detective Pillai testify does not support an inference of bad faith.

In addition, none of the testimony the Court did hear at the evidentiary hearing suggested that either Detective Pillai or the Government acted in bad faith. SA Aldenberg's testimony suggested that the FBI itself was uncertain about the limits of Detective Pillai's special deputation until the eve of the evidentiary hearing. Moreover, when asked by defense counsel at the hearing whether Detective Pillai was conducting surveillance of Mr. Rodriguez and the House as a Hartford police officer or federal task force member, SA Aldenberg testified that he would interpret that Detective Pillai was acting in *both* roles. He explained that task force officers are assigned to collect intelligence and develop sources, and that it is expected that when they conduct

investigations with their own vice and narcotics units, they might sometimes turn over the case to the FBI. Indeed, in the FBI report on search of the House, the FBI special agents refer to Detectives Pillai and Rinaldi as "TFO Pillai" and "TFO Rinaldi," *see* FBI Incident Report by SA James, Ex. C to Mem. in Opp'n [doc. # 33-3], even though, as AUSA Leaming and SA Aldenberg told the Court, there is no paperwork showing that Detective Pillai received special deputation authority for Mr. Rodriguez's case.

Finally, as already discussed, Detective Pillai consulted with the United States Attorney's Office and added a paragraph to his affidavit before submitting it to Magistrate Judge Martinez. Given these steps, and given the United States Attorney's Office's undisputed support of the warrant application, it is not clear which provision of Rule 41 Detective Pillai could have been trying to evade.

In sum, even if Detective Pillai's submission of the application constituted a technical Rule 41 violation – and the Court does not find that it did – there is no evidence that such violation prejudiced Mr. Rodriguez or resulted from Detective Pillai's intentional and deliberate disregard for a provision of Rule 41. Accordingly, the Court rejects Mr. Rodriguez's Rule 41 challenge to the warrant.

### III.

In addition to his Rule 41 argument, Mr. Rodriguez submits that the warrants signed by Magistrate Judge Martinez were invalid under *Franks v. Delaware*, 438 U.S. 154 (1978), because of errors in Detective Pillai's affidavit. Specifically, Mr. Rodriguez claims that Detective Pillai's representation of himself as a Special Deputy United States Marshal in the warrant application "was inaccurate, at best," and that Magistrate Judge Martinez was "misled when she signed the

search warrant." Def.'s Post-Hr'g Mem. [doc. # 42] at 3. In *Franks*, the Supreme Court held that the veracity of a warrant affidavit could be impeached even after a search had been executed. *See Franks,* 438 U.S. at 167. The Court explained that it saw "no principled basis for distinguishing between the question of the sufficiency of an affidavit, which is also subject to post-search reexamination, and the question of its integrity." *Id.* at 171.

As Mr. Rodriguez raises his *Franks* argument for the first time in his post-hearing brief, the Court must decide whether an additional evidentiary hearing is necessary to consider that issue. "To mandate an evidentiary hearing [on a challenge to a warrant under *Franks*], the challenger's attack must be more than conclusory and must be supported by more than a mere desire to cross-examine." *Id.* at 171. "Allegations of negligence or innocent mistake are insufficient." *Id.* "Finally, if these requirements are met, and if, when material that is the subject of the alleged falsity or reckless disregard is set to one side, there remains sufficient content in the warrant affidavit to support a finding of probable cause, no hearing is required." *Id.* at 171-72.

Applying the holding of *Franks* to the facts of this case, no evidentiary hearing on the integrity of Officer Pillai's affidavit is due for at least two reasons. First, to justify a hearing, "[t]here must be allegations of deliberate falsehood or of reckless disregard for the truth, and those allegations must be accompanied by an offer of proof." *Id.* at 171. Although Mr. Rodriguez now alleges that Officer Pillai's representation of himself as a Special Deputy United States Marshal represented a "deliberate falsehood" or "reckless disregard for the truth," he has not provided an offer of proof. Second, the need for an evidentiary hearing under *Franks* only arises where there is an indication that "the issuing magistrate was . . . misled into finding *probable cause* by material omissions for which defendants were knowingly or recklessly responsible." *Walczyk v. Rio*, 496

F.3d 139, 156 (2d Cir. 2007) (citing *Franks*, 438 U.S. at 155-56; *Golino v. City of New Haven*, 950 F.2d 864, 870-71 (2d Cir. 1991)) (emphasis added).

Even if the Court discredits Detective Pillai's identification of himself as a Special Deputy United States Marshal, the substance of the warrant affidavit – the information that established probable cause – is unchanged. *Cf. Arkansas v. Sullivan*, 532 U.S. 769, 771-72 (2001) (noting the Supreme Court's unanimous holding in *Whren v. United States*, 517 U.S. 806, 813 (1996), that "subjective intentions play no role in ordinary, probable-cause Fourth Amendment Analysis" (alteration and quotation marks omitted)); *United States v. Martin*, 157 F.3d 46, 52 (2d Cir. 1998) ("'[M]inor errors or inconsistencies [in supporting affidavits do not] undermine the existence of probable cause.'" (quoting *United States v. Smith*, 9 F.3d 1007, 1014 (2d Cir. 1993)) (second alteration in original)). Because Detective Pillai's status – or lack of status – as a Special Deputy United States Marshal was irrelevant to the existence or absence of probable cause, *Franks* does not mandate exclusion of evidence recovered pursuant to the warrants signed by Magistrate Judge Martinez, whether or not Detective Pillai misrepresented his status in the warrant application.

## IV.

Mr. Rodriguez next challenges whether there was probable cause to issue the search warrants for the House and Honda. Probable cause to search is "demonstrated where the totality of circumstances indicates a fair probability that contraband or evidence of a crime will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). As this Court explained in *Nakouzi*, the probable cause inquiry "requires only 'a *practical, common-sense* decision whether, given all the circumstances set forth in the affidavit . . ., including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Nakouzi*, No. 3:05cr154 (MRK), 2005

WL 3211208, at *7 (D. Conn. Nov. 30, 2005) (quoting *United States v. Martin*, 426 F.3d 68, 74 (2d Cir. 2005)). "Probable cause is not a rigid formula, but rather a 'fluid concept – turning on the assessment of probabilities in particular factual contexts – not readily, or even usefully, reduced to a neat set of legal rules.'" *Id.* (quoting *Gates*, 462 U.S. at 232). Moreover, "a court reviewing a challenged warrant – whether at the district or appellate level – 'must accord considerable deference to the probable cause determination of the issuing magistrate.'" *United States v. Clark*, 638 F.3d 89, 93 (2d Cir. 2011) (quoting *Walczyk*, 496 F.3d at 157).

The detectives' investigation of Mr. Rodriguez and decision to seek a search warrant was based in part on information provided by a confidential informant. As the Second Circuit has stated:

> The core question in assessing probable cause based upon information supplied by an informant is whether the information is reliable. Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of providing reliable information, or if it is corroborated in material respects by independent evidence.

*United States v. Wagner*, 989 F.2d 69, 72-73 (2d Cir. 1993). In this case, both of those indicia of reliability were present.

First, in his affidavit in support of the warrant application, Detective Pillai affirmed that CHS-1, the confidential informant, was "registered as such with the Hartford Police Department," "registered as a confidential source with the FBI," and "ha[d] previously provided reliable and accurate information regarding the sale and distribution of illegal narcotics and the possession of illegal weapons." Pillai Aff. I, Ex. A to Mem. in Opp'n [doc. # 33-1] ¶ 4.

Second, the warrant application was supported not only by the confidential informant's statements to the police, but also by the Hartford police detectives' observations of drug transactions between the confidential informant and Mr. Rodriguez, as well as police

18

surveillance of the House. The confidential informant purchased quantities of heroin from Mr. Rodriguez and Ms. Perez during controlled sales that occurred in a parking lot close to the House. "An informant's participation in supervised drug purchases is powerful corroborative evidence for purposes of determining probable cause." *Wagner*, 989 F.2d at 73. Indeed, the police observed Mr. Rodriguez leave the House and then drive the Honda directly to the parking lot where the drug transactions with the confidential informant occurred. *See* Pillai Aff. I, Ex. A to Mem. in Opp'n [doc. # 33-1] ¶¶ 15, 18. Those observations by the police officers, as well as the calls to Mr. Rodriguez's cell phone from a reliable informant, *see id.* ¶¶ 11, 15, 17, were more than sufficient to establish probable cause to search both the House and the Honda. *See, e.g.*, *Wagner*, 989 F.2d at 73 (holding that "[c]orroboration of information the [confidential informant] gave the officers was amply provided by the fact that the [confidential informant] made six supervised purchases of marijuana and cocaine from members of the alleged conspiracy, and two drug purchases from another suspect").

## V.

Mr. Rodriguez's fourth argument is that the evidence recovered from his person was illegally seized.

Initially, Mr. Rodriguez and the Government agreed that the evidence seized from Mr. Rodriguez's person included cash; cell phones; and keys, one of which was found to unlock a door to the House. However, at the evidentiary hearing, the Government indicated that in fact the keys were not seized from Mr. Rodriguez's person but rather from the Honda. Detective Estrella testified that he did not recover any keys from Mr. Rodriguez and never had possession of any keys recovered from either Mr. Rodriguez or the Honda. Detective Rinaldi testified that although in his report he had listed the keys as well as the cell phones and cash as having been recovered

from Mr. Rodriguez's person by Detective Estrella, he did not personally witness the recovery of any of those items. The Court will return to the issue of the keys at the end of this opinion.

### A.

First, the Court turns to the cash and cell phones, which the parties agree were seized from Mr. Rodriguez's person by Detective Estrella. According to Mr. Rodriguez, the investigators violated the Fourth Amendment when they seized the cash and cell phones because the investigators had no search warrant for his person and none of the exceptions to the warrant requirement applied. Although the parties dispute exactly when the search that led the investigators to discover the cash and cell phones occurred, the Court credits Detective Estrella's testimony that those items were seized from Mr. Rodriguez only after he was brought to the House.

It is undisputed that the investigators did not have a warrant to search Mr. Rodriguez's person. The question is whether the seizure of the cash and cell phones was nonetheless legal because it was in the course of a search incident to a lawful arrest. *See United States v. Robinson*, 414 U.S. 218, 224 (1973); *see, e.g.*, *United States v. Traylor*, 396 F. App'x 725, 727 (2d Cir. 2010) (summary order) ("In sum, we conclude that Traylor's arrest was supported by probable cause and, therefore, the district court correctly refused to suppress items seized in the course of a search incident to arrest." (citing *Robinson*, 414 U.S. at 224; *United States v. Gregg*, 463 F.3d 160, 166 (2d Cir. 2006))). Mr. Rodriguez argues that the search of his person was not incident to a lawful arrest. Moreover, Mr. Rodriguez argues that even if it was legal for the police to place him under arrest and search him at the time the items were seized from him, those actions only occurred after the police (1) placed him under de facto arrest, without probable cause, while they searched his Honda; and (2) kept him under de facto arrest, still without probable cause, when

they transported him to the House. Mr. Rodriguez claims that he was placed under de facto arrest – and not merely stopped or detained for investigative purposes – because the police ordered him out of his car with weapons drawn and placed him in double-handcuffs in the back of a police cruiser, and he argues that the items seized from him must be suppressed as the fruit of that original, allegedly unlawful detention. The Government argues that Mr. Rodriguez was initially placed in investigative detention – not under full arrest – and that the detention was legal. Alternatively, the Government argues that even if the investigators exceeded their authority during their initial detention of Mr. Rodriguez at 72 Albany Avenue, "the investigators were well within their authority to search him once they established probable cause to arrest him," and "[s]ince a post-arrest search of Rodriguez would inevitably have resulted in the seizure of his . . . phones and money, the exclusionary rule does not apply." Mem. in Opp'n [doc. # 33] at 17.

For the reasons that follow, the Court finds that the Fourth Amendment does not demand suppression of the items seized from Mr. Rodriguez's person.

For the purposes of its analysis, the Court will assume that when the police placed Mr. Rodriguez in the police cruiser, handcuffed him, and transported him from 72 Albany Avenue to the House, Mr. Rodriguez was under de facto arrest. If there existed probable cause to arrest Mr. Rodriguez when the police detained him at 72 Albany Avenue, then it was not illegal for the police to place Mr. Rodriguez under de facto arrest, and it was not illegal for the police to search Mr. Rodriguez while he was under arrest. *See, e.g.*, *United States v. Scopo*, 19 F.3d 777, 782 (2d Cir. 1994) (explaining that if the police had probable cause to stop and arrest a suspect, the police were entitled to search the suspect).

Therefore, the Court first considers whether there was probable cause to arrest Mr. Rodriguez at 72 Albany Avenue. The Second Circuit has stated:

Probable cause to arrest a person exists if the law enforcement official, on the basis of the totality of the circumstances, has sufficient knowledge or reasonably trustworthy information to justify a person of reasonable caution in believing that an offense has been or is being committed by the person to be arrested.

*United States v. Valentine*, 539 F.3d 88, 93 (2d Cir. 2008) (quotation marks and citations omitted). "Probable cause requires only a *probability* or *substantial chance* of criminal activity, not an actual showing of such activity." *Gates*, 462 U.S. at 244 n.13 (emphasis added); *see Valentine*, 539 F.3d at 93.

In this case, in support of his application for a search warrant, Detective Pillai affirmed that the investigators had received information from a confidential informant with a reliable track record that Mr. Rodriguez was dealing heroin, and that the information from the informant had been corroborated through two controlled sales and by police surveillance of the House. Magistrate Judge Martinez credited those representations in Detective Pillai's affidavit when she granted the application for a search warrant, and no evidence presented to this Court sheds doubt on Detective Pillai's statements regarding the information received from the confidential informant or the acts by Mr. Rodriguez that were observed by investigators. That information was sufficient to establish probable cause for Mr. Rodriguez's arrest. *See, e.g.*, *United States v. Dewar*, 375 F. App'x 90, 93 (2d Cir. 2010) (summary order) (affirming district court's determination that probable cause supported defendants' arrest "based on (i) the indicia of reliability of the confidential informant. . ., (ii) the monitored and recorded conversations between the [confidential informant] and defendants, and (iii) police surveillance of the [r]esidence" (citing *Caldarola v. Calabrese*, 298 F.3d 156, 162 (2d Cir. 2002))), *vacated and remanded on other grounds* --- U.S. ---, 131 S. Ct. 1570 (2011); *United States v. Manchuca*, 84 F. App'x 156, 157 (2d Cir. 2004) (summary order) (finding that district court properly found

probable cause to arrest and search a defendant where independent evidence had substantiated a confidential informant's claims); *United States v. Gonzalez*, 835 F.2d 449, 451 (2d Cir. 1987) (finding that information from a confidential informant provided probable cause to arrest a defendant where the informant was known to the police force and had proven his reliability, and each of the preliminary details provided by the informant was verified by law enforcement officers).

Although Detective Pillai himself did not detain Mr. Rodriguez at 72 Albany Avenue, Detective Pillai's knowledge of information establishing probable cause for Mr. Rodriguez's arrest may be imputed to the officers who were actually on the scene. "The collective knowledge doctrine provides that, for the purpose of determining whether an arresting officer had probable cause to arrest, 'where law enforcement authorities are cooperating in an investigation, . . . the knowledge of one is presumed shared by all.'" *Savino v. City of New York*, 331 F.3d 63, 74 (2d Cir. 2003) (quoting *Illinois v. Andreas*, 463 U.S. 765, 772  n.5 (1983)). Since Mr. Rodriguez was detained at 72 Albany Avenue by other Hartford Police Department officers involved in the investigation, those officers, like Detective Pillai himself, had probable cause to arrest Mr. Rodriguez when Mr. Rodriguez was ordered out of his car, handcuffed, and placed in the police cruiser. Therefore, the cash and cell phones were recovered from Mr. Rodriguez during a search incident to a lawful arrest, and their seizure did not violate the Fourth Amendment. *See New York v. Belton*, 453 U.S. 454, 461 (1981) ("A custodial arrest of a suspect based on probable cause is a reasonable intrusion under the Fourth Amendment; that intrusion being lawful, a search incident to the arrest requires no additional justification."); *see, e.g.*, *United States v. Villanueva*, 32 F. Supp. 2d 635, 637-68 (S.D.N.Y. 1998) (finding that an officer was entitled to search the defendant's car "as an incident to a lawful arrest" and explaining that the fact that officers "did

not formally arrest the defendant . . . d[id] not render *Belton* inapplicable because the officers effected a de facto arrest").

Next, the Court notes that even if the investigators did not have probable cause to arrest Mr. Rodriguez when they initially detained him at 72 Albany Avenue, and even if the scope of Mr. Rodriguez's initial detention thus violated the Fourth Amendment, that initial unconstitutional seizure did not taint the evidence ultimately recovered from Mr. Rodriguez's person because (1) the investigators certainly had probable cause to arrest Mr. Rodriguez at the time the cell phones and cash were seized from him, and (2) they had lawful grounds to detain Mr. Rodriguez up to that point in time.

First, within minutes after Mr. Rodriguez was handcuffed and placed in the police cruiser at 72 Albany Avenue, investigators at the House recovered a large quantity of heroin, including 1300 bags stamped "Blu Dragon" – the same stamp which marked the bags purchased by CHS-1 directly from Mr. Rodriguez. Thus, when Detective Rinaldi received the call from Detective Pillai directing him to bring Mr. Rodriguez to the House, as well as when Detective Estrella actually recovered the cash and cell phones from Mr. Rodriguez at the House, the investigators undoubtedly had probable cause to arrest Mr. Rodriguez.

Second, whether or not the investigators were initially justified in placing Mr. Rodriguez under de facto arrest at 72 Albany Avenue, any unconstitutional aspects of Mr. Rodriguez's initial detention did not taint the evidence recovered from Mr. Rodriguez's person because, under *Michigan v. Summers*, 452 U.S. 692 (1981), the investigators were permitted to detain Mr. Rodriguez while they searched the Honda.

In *Summers*, the police had detained the defendant while they searched his home. *See id.* at 693. The defendant claimed that the warrantless detention was a seizure in violation of the Fourth Amendment. In rejecting that argument, the Supreme Court explained:

> Of prime importance in assessing the intrusion is the fact that the police had obtained a warrant to search respondent's house for contraband. A neutral and detached magistrate had found probable cause to believe that the law was being violated in that house and had authorized a substantial invasion of the privacy of the persons who resided there. The detention of one of the residents while the premises were searched, although admittedly a significant restraint on his liberty, was surely less intrusive than the search itself.

*Id.* at 701. This case is similar to *Summers* in that the investigators had obtained a warrant to search a location for narcotics and Mr. Rodriguez was detained while the location was searched. *See id.* Moreover, although the defendant in *Summers* was detained during a search of his apartment, while Mr. Rodriguez was detained during the search of his car, Mr. Rodriguez had, in the Government's words, "a documented connection" to the location being searched, and that location was being searched pursuant to a warrant. *See Summers*, 452 U.S. at 703-04 ("The connection of an occupant to [a residence] gives the police officer an identifiable and certain basis for determining that suspicion of criminal activity justifies a detention of that occupant."); *cf. Rivera v. United States*, 928 F.2d 592, 606 (2d Cir. 1991) (noting that "[a]bsent special circumstances, the police of course have the authority to detain occupants of premises while an authorized search is in progress, regardless of individualized suspicion").

Assuming that certain actions taken by the police converted the initial detention of Mr. Rodriguez from a mere stop to a de facto arrest without probable cause, the exclusionary rule bars introduction of the evidence recovered from Mr. Rodriguez's person only if there is a sufficient causal relationship between the police's illegal actions and the discovery of that evidence. *See Segura v. United States*, 468 U.S. 796, 815 (1984); *Mosby v. Senkowski*, 470 F.3d

515, 520-21 (2d Cir. 2006). "Evidence obtained *by exploitation* of a primary illegality is regularly excluded under traditional taint analysis as the 'fruit of the poisonous tree.'" *United States v. Morales*, 788 F.2d 883, 885 (2d Cir. 1986) (citing *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963)) (emphasis added). In this case, even if the police's approach with drawn weapons, handcuffing of Mr. Rodriguez, and placement of Mr. Rodriguez in the police cruiser violated the Fourth Amendment, the items seized from Mr. Rodriguez were not obtained by "exploitation of that primary illegality" but rather "by means sufficiently distinguishable to be purged of the primary taint." *Wong Sun*, 371 U.S. at 488.

Mr. Rodriguez has also argued that the initial pat down searches conducted by Detective Rinaldi and Detective Estrella were unconstitutional, and that the items recovered from his person should be excluded on that basis. Because the police were executing a search warrant in the course of a narcotics investigation, and because the police had at minimum reasonable, articulable suspicion that Mr. Rodriguez was a narcotics dealer, the Court is confident that the pat down searches did not violate the Fourth Amendment. The Second Circuit has held that police may frisk a suspect who has been stopped on suspicion of narcotics dealing, based on the fact that narcotics dealers frequently carry weapons. *See United States v. Salazar*, 945 F.2d 47, 51 (2d Cir. 1991). The Supreme Court's holding in *Arizona v. Johnson*, --- U.S. ---, 129 S. Ct. 781 (2009), that "to proceed from a stop to a frisk, a police officer must reasonably suspect that the person stopped is armed and dangerous," *id.* at 784, is not to the contrary. Regardless, because the cell phones and cash were not seized from Mr. Rodriguez as a result of one of the pat down searches, but rather were recovered later, in the course of a search incident to arrest, there was no causal relationship between the pat-downs and the seizure of those items, and the legality or illegality of the pat down searches is thus irrelevant. *See Wong Sun*, 371 U.S. at 488.

In sum, because the Fourth Amendment unquestionably allowed the police to detain Mr. Rodriguez up to the point in time when investigators discovered heroin at the House, because the discovery of that heroin dispelled whatever lingering doubts there may have been regarding the existence of probable cause to arrest Mr. Rodriguez, and because the cash and cell phones were only seized from Mr. Rodriguez's person after probable cause for his arrest was established, there is no basis to suppress that evidence, *even if* aspects of Mr. Rodriguez's initial detention violated the Fourth Amendment.

**B.**

The Court now returns to the matter of the keys to the House. An inventory form, two incident reports, and Detective Pillai's affidavit in support of the criminal complaint against Mr. Rodriguez all indicate that a key or keys to the House were seized from Mr. Rodriguez's person. *See* FBI Incident Report by SA James, Ex. C to Mem. in Opp'n [doc. # 33-3] at 4 (listing "Miscellaneous Keys" as seized from Mr. Rodriguez by Detective Estrella); FBI Incident Report by TFO Rinaldi, Ex. F to Mem. in Opp'n [doc. # 33-6] at 3 (listing "Keys to 146 Mark Twain Drive" as an item "collected from RAFAEL RODRIGUEZ's person by TFO Estrella and Hartford Police Officer O'Brien"); Pillai Aff. II, Ex. H to Mem. in Opp'n [doc. # 33-8] ¶ 11 ("RODRIGUEZ had in his possession a set of keys, one of which opened the front and rear door of the Premises."); Inventory Form, Ex. D to Mem. in Opp'n [doc. # 33-4] (listing "Keys Rafael Rodriguez to 146 Mark Twain" with a "Location Seized" as "Rodriguez's person; Traffic stop at 72 Albany Ave").

However, as already noted, the Government now claims that the keys were recovered from the Honda rather than from Mr. Rodriguez himself, and Detective Estrella testified that he

did not recover any keys from Mr. Rodriguez and never had possession of any keys recovered from either Mr. Rodriguez or the Honda. Detective Rinaldi testified that although in his incident report he listed the keys as having been recovered from Mr. Rodriguez, he did not personally witness the recovery of the keys, and his report was based on what was told to him by Detective Estrella and SA Ryan James. The Search and Seizure Warrant for the Honda authorized the investigators to search for many items – including, among others, residue of controlled substances; safety deposit box keys; and cellular telephones and electronic paging devices – but those items did not include keys to the House or any other residence. *See* Search and Seizure Warrant for 2008 Honda Accord Bearing Connecticut Registration Plate 253-XWA, *USA v. Sealed Search Warrant*, 3:11-mj-97-DFM (D. Conn. Apr. 19, 2011), ECF No. 4; Attachment A to Application for Search Warrant, *USA v. Sealed Search Warrant*, 3:11-mj-97-DFM (D. Conn. Apr. 19, 2011), ECF No. 1, at 2. Thus, whether the keys were seized from the Honda or from Mr. Rodriguez's person, they were recovered as the result of a warrantless search.

It is the Government's burden to demonstrate the legality of a warrantless search. *See United States v. Knoll*, 16 F.3d 1313, 1321 (2d Cir. 1994) (noting "the heavy burden borne by the government in justifying a warrantless search"). The Government now alleges that the keys were seized from the Honda, and claims that "the keys were properly seized under the same authority or as evidence from the search of the vehicle for which the officers had a valid search warrant." Government's Post-Hr'g Mem. in Opp'n [doc. # 44] at 7. As Mr. Rodriguez points out, though, the warrant for the Honda did not authorize the seizure of any house keys. Thus, if the officers discovered that Mr. Rodriguez possessed a key to the House by attempting to unlock doors to the House using keys seized from the Honda, that evidence presumably must be excluded because it resulted from "action . . . unrelated to the objectives of the authorized intrusion," which

constituted an "additional invasion of [Mr. Rodriguez's] privacy interest." *Arizona v. Hicks*, 480 U.S. 321, 325 (1987).

At the same time, no witness at the evidentiary hearing testified that he or she personally observed the seizure of the keys at issue, and all the documentary evidence indicates that the keys were seized from Mr. Rodriguez's person. Moreover, while some of the documentary evidence suggests that the keys were seized from Mr. Rodriguez after Mr. Rodriguez was transported to the House, *see, e.g.*, Pillai Aff. II, Ex. H to Mem. in Opp'n [doc. # 33-8] ¶ 11, SA James's inventory form states that the keys to the House were seized at 72 Albany Avenue. *See* Inventory Form, Ex. D to Mem. in Opp'n [doc. # 33-4]. Thus, the Government has not even established the particular circumstances of the keys' seizure, let alone justified the seizure under an established exception to the warrant requirement or argued convincingly that a new exception should be recognized. For those reasons, the Court finds that the Government has not met its burden with respect to the keys to the House, and will grant Mr. Rodriguez's request to exclude those keys from the evidence at trial.

## VI.

The Motion to Suppress [doc. # 27] is therefore GRANTED IN PART and DENIED IN PART. The Court GRANTS Mr. Rodriguez's motion with respect to the keys to the House. The Court DENIES Mr. Rodriguez's motion with respect to the items of evidence found inside the House; the cell phones and cash recovered from Mr. Rodriguez's person; and Mr. Rodriguez's statements to investigators. However, with regard to the request for the Court to suppress Mr. Rodriguez's statements to investigators, the Court's denial of the Motion to Suppress is without

prejudice to renewal, should the Government decide that it wishes to introduce those statements during its case in chief.

IT IS SO ORDERED,

/s/   \_\_\_\_Mark R. Kravitz_____
     United States District Judge

**Dated at New Haven, Connecticut: June 20, 2011.**